```
         UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF WEST VIRGINIA
                 AT CHARLESTON
```

**PAMELA FISHER,**

      Plaintiff

v.                                      Civil Action No. 2:07-0764

**AT&T MOBILITY, LLC, doing business as Cingular Wireless, LLC,**

      Defendant

## MEMORANDUM OPINION AND ORDER

Pending is the motion for summary judgment of defendant AT&T Mobility, LLC ("AT&T"), filed August 20, 2008.

### I.

Pamela Fisher alleges in her one-count complaint that she was constructively discharged by her former employer, AT&T, in violation of the West Virginia Human Rights Act ("WVHRA"). Fisher began working for AT&T as a corporate account executive in January of 2002. (Fisher dep. 21). Her duties primarily involved selling AT&T wireless products and services in West Virginia. (Id. at 35-36).

AT&T maintained an office in downtown Charleston, which

was later relocated to Teays Valley; however, Fisher and other account executives worked primarily from their homes.  (<u>Id.</u> at 43-44).  Account executives were each assigned to a specific geographic territory, which could be changed from time to time.  (Hunter dep. 30-31, Jun. 18, 2007).

Account executives were supervised by a sales manager, who was in turn supervised by a director of sales.  Fisher was supervised by a number of sales managers during her employment, including Brenda Hanson from January 2002 until February 2004; Melvin Hunter from March 2004 to February 2005; Richard Conklin from March 2005 until December 2005; and Lawrence Langberg from December 2005 until August 2006, when Fisher resigned.  John Ryder became the director of sales in December 2003.  (Ryder dep. 6).

Over the past twenty years, West Virginia staffing levels declined.  In 1991, when Brenda Hanson first became sales manager, twenty-six corporate account executives reported to her.  (Hanson dep. 15-16).  In 2002, when Fisher started working at AT&T, the number had fallen to ten.  (Fisher dep. 40-41).  By December 2004, there were three, and by May 2006, there were only two, one of whom was Fisher.  (<u>Id.</u> at 78, 101-02).

2

At the time Ryder became director of sales in December 2003, six sales managers reported to him, including the sales manager in Charleston, who was then Brenda Hanson. (Ryder dep. 6-7). Four of the six sales managers were male. The two female sales managers were Hanson and Colleen Dougherty. Within two months of Ryder becoming director of sales, Dougherty left her position as sales manager and took another position within the company, and Hanson was terminated. (Id. at 11-12). Hanson was replaced by Melvin Hunter. At the time that Hanson was terminated, she was supervising six account executives: Carl Krzys, Melvin Hunter, Mary Ann Ehman, Lavonne Withrow, Candace Fiore, and Pam Fisher. (Hanson dep. 29-30).

A. Events Leading up to Fisher's Resignation

In 2002 and 2003, Fisher received annual performance appraisals prepared by Hanson. (Hanson dep. 43). In 2002, Fisher met 77% of her sales quota. (2002 Annual Performance Review). Her overall business results rating was "met targets," and she was rated as "proficient" for personal performance results. (Id.). These ratings placed Fisher in the middle of a scale of five possible ratings. (Id.). In 2003, Fisher met 84% of her sales quota, but her overall business rating fell to

3

"partially met targets," the next to lowest rating category out of five, and her personal performance rating stayed the same at "proficient."[1]  (2003 Annual Performance Review).

In early 2004, Hanson placed two account executives, Mary Ann Ehman and LaVonne Withrow, on a performance improvement plan ("PIP").  (Hanson dep. 53-54, 60, 63).  Employees are placed on PIPs when their performance falls below what the company considers to be an acceptable level.  (Fisher dep. 61; Hunter dep. 37, Jun. 18, 2007).  The purpose of the PIP is to allow an employee to improve their performance and avoid discharge.  (Fisher dep. 61; Hunter dep. 37, Jun. 18, 2007).  Additionally, Withrow was placed on a final warning.  (Hanson dep. 58-59).  Withrow resigned in response to the PIP and warning.  (Hunter dep. 34, Jun. 18, 2007).

Hanson was discharged in February 2004 and replaced by Hunter.  Hanson does not claim that her discharge was motivated by her gender.  (Hanson dep. 44-45, 48).  Ehman was discharged in March of 2004 when she failed to improve under the PIP.  (Hunter dep. 36, Jun. 18, 2007).  Ehman does not contend that she was discharged because of her gender.  (Ehman dep. 36).

---

[1] The parties have not presented evidence of Fisher's 2004 and 2005 performance appraisals, if any were conducted.

In March 2004, Hunter placed Fisher on a PIP because she was failing to meet her sales goals. (Fisher dep. 61; Hunter dep. 36-38, 43, Jun. 18, 2007). Thereafter, Fisher's performance quickly improved and she was taken off of the PIP. (Hunter dep. 37-38, Jun. 18, 2007).

In late 2004, AT&T's Business Security and Human Resources groups initiated an investigation relating to certain business practices engaged in by Ryder and the members of his West Virginia team. (Ryder aff. ¶ 3). At the conclusion of that investigation, the Business Security group concluded that Fisher had violated business policies and recommended that she be terminated. (Id.). Ryder states in his affidavit that he suggested to the Business Security group that they simply issue her a warning instead. (Id.). Hunter recalls, however, that Ryder had indicated to him that Fisher should be discharged for the violations, but that Hunter had declined to do so. (Hunter dep. 51, Feb. 6, 2007). Ultimately, Ryder issued Fisher a written warning on February 11, 2005. (Ryder aff. ¶ 3). He prepared similar warnings for all of the other West Virginia account executives, but before he sent them out, he received an email from Fisher defending her actions. (Id.).

In the email, Fisher indicated that all of the account executives were engaging in the conduct for which she was being warned and that she felt she was being singled out for investigation and reprimand. (Fisher email, undated). She also observed that the office had endured three terminations in 2004 and that each of the three individuals terminated was female and each was at "at odds with" Carl Krzys, one of the account executives. (Id.). Fisher asked that the warning be rescinded and that it be removed from her personnel file. (Id.). After receiving this email, Ryder decided to issue no further warnings pending resolution of Fisher's grievances. (Ryder aff. ¶ 3).

On February 25, 2005, Ryder emailed Fisher that her "willingness to learn from this experience, and take some responsibility, has contributed to our willingness to reconsider." (Ryder email, Feb. 25, 2005). Fisher's warning was rescinded and not placed in her file. (Id.). On March 14, 2005, Ryder issued a "Memo of Concern" to all of the West Virginia account executives addressing the same issues that had been the subject of the rescinded warning. (Memo of Concern, Mar. 14, 2005).

Fisher took an extended leave of absence from November 2005 to July 2006 because of an ankle fracture. (Fisher dep. 12-

13, 15). When her leave commenced, Richard Conklin had replaced Hunter as sales manager. Fisher alleges that shortly after beginning her leave, Conklin told her that Ryder was "out to get" her and would terminate her when she returned to work from medical leave. (Fisher dep. 79-80). Conklin denies making this statement and, rather, contends that his communications with Fisher concerned management discussions of staffing needs and the possibility of future downsizing in the West Virginia office. (Conklin dep. 15-16, 22-23, 26). Conklin testifies in his deposition that similar staffing discussions were underway in every AT&T region in the country, and that, in West Virginia, the downsizing was tied to the relatively small number of business accounts in the market. (Id. at 27-29, 36-37). Ryder and Conklin both contend that Ryder never stated that he wanted to discharge Fisher or that Fisher's employment should be terminated. (Id. at 24-28, Ryder dep. 32, 39-40, 46-47).

      Fisher completed her leave of absence and returned to work on July 3, 2006. (Fisher dep. 12-13). At the time, there was only one other account executive remaining in West Virginia. He was reporting daily for work to the AT&T office, which was then located in Teays Valley, and Fisher was advised that she would be expected to do the same. (Fisher dep. 34, 106-07).

According to Fisher, some of the office employees "would talk behind [her] back and say things when [she] would walk in the office. They would snicker behind [her] back and things like that." (Id.).

B. Fisher's Resignation

On August 4, 2006, Fisher submitted a letter of resignation to AT&T. (Fisher dep. 129-30; Fisher email, Aug. 4, 2006). In her letter, she stated:

> Please accept this letter as my formal resignation from my position with [AT&T]. I have accepted a position in the pharmaceutical industry and my last date of employment will be August 18, 2006.
>
> Although I have enjoyed working at [AT&T] I feel I could not pass up this opportunity to take my career in a new and exciting direction. I would like to express my gratitude to [AT&T] for the training and guidance I have been given. I will always be appreciative.

(Fisher email, Aug. 4, 2006).

After Ryder and Langberg, then sales manager, received Fisher's resignation letter, they both contacted her. (Fisher dep. 130-32). Both asked if there was anything that AT&T could do to convince her to stay with AT&T. (Id.). Fisher declined and commenced her new career.

The evidence shows that Fisher began her search for alternate employment as early as March 2004, when she obtained a letter of recommendation from Hanson for the purpose of seeking new employment in the pharmaceutical industry. (Hanson dep. 48-49). Between December 2004 and July 2005, Fisher sought employment with AstraZeneca, Boerhringer Ingelheim Pharmaceuticals, Merck & Co., and Abbot Pharmaceuticals, and also registered her resume with Renaissance Search, a headhunting firm. (Fisher dep. 52-53; Exhibit O to Def.'s Mot.). In June of 2006, Fisher affiliated with National Register, another headhunting firm, which arranged interviews for her with Kendall-LTP and Tyco Healthcare. (Exhibit P to Def.'s Mot.). On July 27 and 28, 2006, Fisher interviewed with ProEthic Pharmaceutical, which made her an employment offer on July 31, 2006. (Fisher emails, Jul. 27 & 28, 2006; Fisher dep. 21-22, 129-130). She accepted the position with ProEthic Pharmaceutical. (Fisher dep. 21-22, 129-130). Fisher testified in her deposition, however, that if she had not been hired by ProEthic, she would have remained with AT&T. (Id. at 130).

C. Fisher's Wrongful Discharge Claim

Fisher alleges that after Ryder became the sales

director, he picked off and fired all of the women on the sales team until Fisher was the only one left. (Fisher dep. 66). She further alleges that all of the women were replaced with younger men, and all of the younger men were given better territories and better accounts. (Id. at 67).

Fisher further states in her deposition that Hunter told her that he lost his job as sales manager in 2005 because he would not fire her. (Id. at 29, 31). However, Hunter testifies in his deposition that when he left AT&T it was because the sales manager position was no longer going to be located in West Virginia. (Hunter dep. 17-18, Jun. 18, 2007). Rather, the West Virginia territory had been split down the middle, half going to Cleveland and Columbus and the other half to Richmond. (Id.). AT&T had acquired U.S. Cellular in Richmond, and the agreement required AT&T to continue to employ all of the U.S. Cellular employees. (Id.). U.S. Cellular already had a sales manager located in Richmond, namely, Richard Conklin, and he became the sales manager for the West Virginia territory. (Id.). According to Hunter, AT&T offered him a position as an account executive, but he declined and left the company because he did not want to displace one of the other account executives on his staff and he did not want to risk losing the severance package offered and

accept a lower level position when AT&T could not tell him at the time what his compensation or quota would be if he became an account executive.  (Id. at 18-19).

In support of her claim, Fisher also offers the deposition testimony of Hanson, who states that, in her opinion, AT&T management discriminated against Fisher because of her gender.  (Hanson dep. 33-34).  Specifically, Hanson states that when Fisher was on medical leave for heart surgery in 2002 and 2003, Human Resources contacted Hanson and instructed Hanson to "get [Fisher] off the payroll."  (Id. at 34).  She also states that Charlie Brooks, the general manager, was upset that Hanson and some of the other account executives had taken a gift to Fisher while she was in the hospital.  (Id. at 35-36).  However, when Hanson was pushed by defense counsel to state why she believed this conduct was gender-based, Hanson responded that there was nothing about the comments that led her to believe that they were based on sex.  (Id. at 37).  Rather, according to Hanson, Fisher "was on medical leave.  I just didn't think they should try to get rid of her when she's on medical leave." (Id.).

Finally, Hanson further states that AT&T opposed her efforts to hire female employees and was trying "to get rid of"

11

the female account executives.  (Id. at 33).  According to Hanson, AT&T transferred accounts away from more senior account executives, such as Mary Ann Ehman and Pam Fisher, and gave the accounts to junior male account executives.  (Id. at 37).  Specifically, she states that when Carl Kryzs was hired, Charlie Brooks, who was the general manager, gave him the Kanawha County territory despite Hanson's request to give Kanawha County to a more senior account executive.  (Id.).  When Hanson asked Brooks his reason for doing so, Brooks responded that Krzys was his buddy and was from his hometown.  (Id.).  Additionally, Hanson testifies that although LaVonne Withrow and Mary Ann Ehman were terminated for poor performance, their poor performance was inevitable because their accounts were taken away and sent to Pittsburgh.  (Id. at 45).  However, she stated earlier in her deposition testimony that work was taken away from all sales people in Charleston, male and female.  (Id. at 9).

       Hanson testifies that she overheard AT&T "sales people talk about the boys' club" and that "you had to be a certain age and be male."  (Id. at 45).  She recalled that these discussions were had in the presence of Charlie Brooks, the general manager, and Susan Dingess of the Human Resources Department, and that they just laughed about it.  (Id.).

12

II.

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id. The moving party has the burden of showing -- "that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial. Fed. R. Civ. P. 56(c); id. at 322-23. A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-

movant.  <u>Williams v. Griffin</u>, 952 F.2d 820, 823 (4th Cir. 1991).

Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party.  <u>Anderson</u>, 477 U.S. at 248.  Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute.  <u>Overstreet v. Ky. Cent. Life Ins. Co.</u>, 950 F.2d 931, 937 (4th Cir. 1991).

A court must neither resolve disputed facts nor weigh the evidence, <u>Russell v. Microdyne Corp.</u>, 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility.  <u>Sosebee v. Murphy</u>, 797 F.2d 179, 182 (4th Cir. 1986).  Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor.  <u>Charbonnages de France v. Smith</u>, 597 F.2d 406, 414 (4th Cir. 1979).  Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962).

**III.**

A constructive discharge action arises under the WVHRA "when the employee claims that because of age, race, sexual, or other unlawful discrimination, the employer has created a hostile working climate which was so intolerable that the employee was forced to leave his or her employment." Slack v. Kanawha County Hous. and Redevelopment Auth., 188 W. Va. 144, 145, 423 S.E.2d 547, 548 syl. pt. 4 (1992). A plaintiff must show that the working climate or conditions were so intolerable that a reasonable person would be compelled to quit, but a plaintiff need not show that the employer's actions were taken with a specific intent to cause the plaintiff to quit. Id. at 549 syl. pt. 5.

AT&T seeks summary judgment on the grounds that Fisher has failed to show that the conduct alleged to create a hostile environment was gender-based, and further that she has failed to establish that her working conditions were so intolerable that a reasonable person would feel compelled to quit. (Def.'s Mem. Supp. Mot. 12-19). Fisher responds with only summary conclusions that she was exposed to hostile working conditions and that Ryder was picking off all of the female employees. (Pl.'s Response

15

20).

As AT&T aptly notes, the record is lacking in evidence that AT&T created a hostile working environment because of Fisher's gender.  Although several female coworkers, including Hanson, Ehman and Withrow, were either terminated or resigned after Ryder became the director of sales, none of these individuals contend that their employment ended because of their gender.  Additionally, Fisher ignores the evidence tending to show that staffing levels in West Virginia have been reduced significantly over the past several years.  At the time that Fisher resigned from her employment, only two account executives remained, herself and one male.  With respect to the warning issued on February 11, 2005, the warning was ultimately rescinded and a "Memo of Concern" addressing the same conduct was issued to all West Virginia account executives, both male and female.  While Fisher contends that her coworkers snickered and talked behind her back, she does not allege that any of this was done on the basis of her gender.  Moreover, although Hanson testifies that she believes that AT&T discriminated against Fisher, Hanson is unable to articulate any reason why she believes that the allegedly discriminatory actions were taken because Fisher is a woman.  In sum, none of the allegedly discriminatory acts against

Fisher appear to be based upon a protected trait such as her sex. To be actionable, a constructive discharge claim arising under the WVHRA must be supported by evidence that the employer created a hostile working climate "because of age, race, sexual, or other unlawful discrimination." Slack, 423 S.E.2d at 548 syl. pt. 4. Inasmuch as Fisher has failed to show that the allegedly hostile environment was based upon her sex, summary judgment on that score is proper.

Additionally, Fisher has failed to establish that her working conditions were so intolerable that a reasonable person would feel compelled to quit. As AT&T observes, Fisher remained employed nearly three years after the termination of the employment of Hanson, Ehman, and Withrow; the PIP was designed to help Fisher improve her performance, not to punish her for poor performance; and the February 11, 2005, written warning was ultimately rescinded and predated Fisher's resignation by eighteen months. (Def.'s Mem. Supp. Mot. 15-16).

In Williams v. Giant Food Inc., 370 F.3d 423 (4th Cir. 2004), the Fourth Circuit found that a plaintiff failed to allege a constructive discharge claim where the plaintiff left her employment under less favorable circumstances than those alleged

17

by Fisher.[2]  The plaintiff in Williams alleged that her supervisors yelled at her, told her she was a poor manager and gave her poor evaluations, chastised her in front of customers, and once required her to work with an injured back.  Id. at 434.  The court held that "these allegations, even if true, do not establish the objectively intolerable working conditions necessary to prove a constructive discharge."  Id.  The court further noted, "[d]issatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign."  Id.  In short, an employee is guaranteed a working environment free of unlawful discrimination but not necessarily free of stress.  Carter v. Ball, 33 F.3d 450, 459 (4th Cir. 1994).

      The court does not doubt that Fisher's working environment was stressful, but the conduct alleged to be intolerable does not rise to the level of being so objectively intolerable that a reasonable person would feel compelled to quit.  Accordingly, summary judgment is also proper inasmuch as Fisher has failed to demonstrate that the conditions under which

---

[2] The West Virginia Supreme Court of Appeals has adopted constructive discharge standards developed by federal courts under Title VII.  Slack, 423 S.E.2d at 556.

18

she left were sufficiently intolerable to be actionable under the WVHRA.

IV.

Based upon the foregoing, it is ORDERED that the defendant's motion for summary judgment be, and it hereby is, granted.  The court further ORDERS that this action be, and it hereby is, dismissed and stricken from the court's docket.

The Clerk is directed to forward copies of this written opinion and order to all counsel of record.

DATED:  November 10, 2008

John T. Copenhaver, Jr.
United States District Judge